[Cite as *Orion Mgt., Inc. v. Kaeka*, 2025-Ohio-1047.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

ORION MANAGEMENT, INC.

      Appellant/Cross-Apellee

      v.

BRITTNEY KAEKA, et al.

      Appellees/Cross-Appellants

C.A. No.     30797

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CV-2019-10-4202

DECISION AND JOURNAL ENTRY

Dated: March 26, 2025

---

FLAGG LANZINGER, Presiding Judge.

**{¶1}** Appellant/Cross-Appellee, Orion Management, Inc. ("Orion"), appeals from the judgment of the Summit County Court of Common Pleas. Additionally, Appellees/Cross-Appellants, Brittney Kaeka and Brittany Latham ("Homeowners"), cross-appeal from the trial court's judgment. This Court affirms.

I.

**{¶2}** Homeowners purchased a house in Akron. Before they could move in, a storm occurred. It caused a large tree to fall. The tree crashed through the middle of the roof at the back of the house. That portion of the house consisted of a family room with a cathedral ceiling. The tree destroyed all but the back wall of the family room, causing significant property damage. Homeowners learned of the incident shortly after it occurred. They immediately drove to the house.

{¶3}   Orion is an insurance restoration contractor.  When it learns a catastrophic event has occurred, it dispatches an employee to the scene of the event to offer restoration services to affected individuals.  One of Orion's employees met with Homeowners at their new house.  As a result of that meeting, Homeowners signed an Authorization to Perform and Direction of Payment ("the Contract").  The Contract called for Orion to remove the felled tree and rebuild the house.

{¶4}   Orion boarded up and placed tarps on the house to protect it from intrusion and further weather-related damage.  A period of delay then ensued while Orion met with the adjuster from Homeowners' insurance company, prepared bids and a scope of work, hired an architect to design the rebuild, and secured a permit.  Although Orion performed some demolition work before securing the permit, its repair work did not begin for more than two months.

{¶5}   During the period of delay that ensued, the tarp on the house shifted and tore.  Water entered the house through the open roof and eventually led to additional damage in other areas of the house.  For example, the hard wood flooring in other rooms rippled, the kitchen countertops and cabinets bubbled and molded, the bathroom flooded, and the ceiling in the office collapsed due to water absorption.  According to Homeowners, Orion ignored their concerns about water damage, failed to properly protect the house from adverse weather conditions, and failed to mitigate the water damage (e.g., by installing dehumidifiers).  According to Orion, it placed tarps on the house on at least two separate occasions and was unable to guarantee dry conditions due to the extent of the damage, the debris, and natural weather conditions.  The additional damage caused Orion's initial rebuilding estimate to increase by more than $30,000.

{¶6}   Homeowners became dissatisfied with Orion's work before Orion could complete the rebuild.  Of particular concern, they believed the height of the new ceiling Orion installed in the family room did not match the height of the old cathedral ceiling.  Homeowners instructed

Orion to place a hold on its work and provide a bill for the services it had performed to date. They then sent a letter to Orion outlining their concerns and requesting various issues be addressed. Orion responded in writing and attempted to reach Homeowners by phone. Meanwhile, it directed its crews elsewhere and removed the lockbox at the property. It is undisputed that, at that point, Orion had not received any form of payment from Homeowners. When Homeowners failed to reply to Orion, it notified them that it intended to file a mechanic's lien against them for their outstanding balance. Again, Homeowners did not respond. Orion then filed a lien and this lawsuit.

{¶7} Orion filed suit against Homeowners for breach of contract.[1] Homeowners answered and filed the following counterclaims against Orion: (1) breach of the Consumer Sales Practices Act ("CSPA"), (2) breach of the Home Solicitation Sales Act ("HSSA"), (3) breach of the Home Construction Service Act ("HCSA"),[2] (4) breach of contract, (5) slander of title, and (6) quiet title. The final two counterclaims concerned the mechanic's lien Orion had filed.

{¶8} Orion moved for summary judgment on Homeowners' first and fifth counterclaims. Homeowners responded in opposition, and Orion filed a reply. Meanwhile, Homeowners moved for summary judgment on Orion's claim for breach of contract. Orion filed a brief in opposition, and Homeowners filed a reply.

{¶9} The trial court granted Orion's motion for summary judgment against Homeowners on their CSPA counterclaim. It found the CSPA did not apply because Orion and Homeowners had not engaged in a consumer transaction. It found that they had engaged in a transaction

---

[1] Orion also named Homeowners' mortgage lender. Because it later dismissed its complaint against the lender, we limit our discussion to Homeowners.
[2] Though frequently termed the Home Construction Service Suppliers Act and abbreviated "HCSSA," the parties and the lower court routinely eliminated the word "Suppliers" when referencing and abbreviating the Act. To avoid unnecessary confusion, we adopt their nomenclature.

involving a home construction service contract. More specifically, it found that they had executed a cost-plus contract. The trial court also (1) granted Orion's motion for summary judgment against Homeowners on their slander of title counterclaim, and (2) denied Homeowners' motion for summary judgment against Orion on its breach of contract claim. Homeowners moved the court to reconsider its ruling, but the court denied their motions for reconsideration.

{¶10} After the trial court issued its summary judgment ruling, the parties filed motions in limine. Relevant to this appeal, the parties asked the trial court to exclude the following evidence. Homeowners moved to exclude any mention of insurance payments they received. Orion moved to exclude any reference to (1) alleged violations of the HSSA, and (2) two sections of the HCSA (i.e., R.C. 4722.02(A) and (B)). The trial court ultimately granted each of the foregoing motions. In doing so, the court specifically found Homeowners' counterclaim for breach of the HSSA was moot. It cited its earlier summary judgment ruling that the parties had executed a home construction service contract.

{¶11} A jury trial ensued. At its conclusion, the jury found in favor of Homeowners on the breach of contract claim/counterclaim. The jury found in favor of Orion on the counterclaim for breach of the HCSA. The jury awarded Homeowners $118,848.37 in damages. The trial court entered judgment in favor of Homeowners in that amount. Additionally, the court ordered the mechanic's lien placed on the property released and quieted title to the property.

{¶12} Orion filed a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Homeowners responded in opposition. Upon review, the trial court denied Orion's motion.

{¶13} Orion has appealed from the trial court's judgment. Homeowners have cross-appealed. Their appeals set forth a total of seven assignments of error for review. For ease of analysis, this Court rearranges and consolidates several of the assignments of error.

II.

HOMEOWNERS' ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED IN GRANTING ORION'S MOTION FOR SUMMARY JUDGMENT ON [HOMEOWNERS'] COUNTERCLAIM UNDER OHIO'S CONSUMER SALES PRACTICE ACT.

HOMEOWNERS' ASSIGNMENT OF ERROR IV

THE TRIAL COURT ERRED IN GRANTING ORION'S MOTION FOR SUMMARY JUDGMENT ON [HOMEOWNERS'] COUNTERCLAIM FOR SLANDER OF TITLE.

{¶14} In their first and fourth assignments of error, Homeowners argue the trial court erred when it awarded summary judgment to Orion on their counterclaims for breach of the CSPA and slander of title. For the following reasons, we reject their assignments of error.

{¶15} Under Civ.R. 56(C), summary judgment is appropriate if:

(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.

*Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977). To succeed on a motion for summary judgment, the party moving for summary judgment must first be able to point to evidentiary materials that demonstrate there is no genuine issue as to any material fact, and that it is entitled to judgment as a matter of law. *Dresher v. Burt*, 75 Ohio St.3d 280, 292 (1996). If the movant satisfies this burden, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 293, quoting Civ.R. 56(E). This Court reviews an award of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105 (1996).

CSPA

{¶16} "The CSPA was enacted in 1972 and prohibits suppliers from committing unfair, deceptive, or unconscionable acts or practices in connection with consumer transactions." *Krueck v. Youngstown State University*, 2019-Ohio-3219, ¶ 13 (9th Dist.), citing R.C. 1345.02 and 1345.03. It defines a "[c]onsumer transaction" as "a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things." R.C. 1345.01(A). Importantly, that definition does not include "transactions involving a home construction service contract as defined in section 4722.01 of the Revised Code . . . ." R.C. 1345.01(A). Although the CSPA used to govern residential construction contracts, the legislature enacted the HCSA in 2012 "to make changes relative to residential construction and the [CSPA] and to establish laws governing the practices of home construction service suppliers." Am.Sub.H.B. No. 383, 2012 Ohio Laws File 107.

{¶17} R.C. 4722.01 et seq. sets forth the HCSA. Under the HCSA, a home construction service contract is one "between an owner and a supplier to perform home construction services, including services rendered based on a cost-plus contract, for an amount exceeding twenty-five thousand dollars." R.C. 4722.01(C). At the time Homeowners contracted with Orion, the HCSA defined the phrase "[h]ome construction service" as follows:

> "Home construction service" means the construction of a residential building. "Home construction service" does not include construction performed on a structure that contains four or more dwelling units, except for work on an individual dwelling unit within that structure, or construction performed on the common area of a condominium property.

Former R.C. 4722.01(B). A "[r]esidential building" was and still is defined as "a one-, two-, or three-family dwelling and any accessory construction incidental to the dwelling." Former R.C. 4722.01(F); R.C. 4722.01(F).

{¶18} Orion moved for summary judgment against Homeowners based on their depositions and exhibits referenced in those depositions. Homeowners both testified that they hired Orion after a tree destroyed a portion of their newly purchased home. They testified that Orion removed the tree, placed tarps on their home, and later began rebuilding it. Although Homeowners took issue with Orion's work, they admitted that Orion installed new subflooring, reframed their living room, constructed and installed new trusses, and installed a new roof. They admitted that they received at least one estimate for the work that needed to be performed, estimating the final cost to be over $70,000. They also admitted that, after Orion stopped working, it sent them a bill for $58,093.74.

{¶19} Orion argued it was entitled to summary judgment because its contract with Homeowners was not a "consumer transaction" governed by the CSPA. *See* R.C. 1345.01(A). Orion argued the Contract was a home construction service contract governed by the HCSA. Homeowners opposed Orion's motion for summary judgment in a brief in opposition as well as two motions for reconsideration. They raised new arguments in their motions for reconsideration, which the trial court considered on the merits. The trial court found Orion was entitled to summary judgment because the CSPA did not apply to the Contract.

{¶20} Homeowners argue the trial court erred by awarding Orion summary judgment for three reasons. First, they argue that Orion failed to support its motion with any Civ.R. 56(C) evidence. Second, they argue the trial court erred when it found the HCSA applied to the Contract.

Finally, they argue the trial court erred when it found the Contract was a cost-plus contract under R.C. 4722.02(A). We address each of their arguments in turn.

**{¶21}** Civ.R. 56(C) limits the type of evidence a court may consider in awarding summary judgment. "[A] deposition transcript must be authenticated before it can be considered as legally acceptable evidence for summary judgment purposes." *King v. Rubber City Arches, L.L.C.*, 2011-Ohio-2240, ¶ 19 (9th Dist.). Other evidence falling outside the scope of Civ.R. 56(C) must be incorporated by reference in a properly framed affidavit. *Wicks v. Lover's Lane Market*, 2022-Ohio-2652, ¶ 9 (9th Dist.). If it is not and the non-moving party objects to it, the trial court may not consider it. *McHugh v. Zaatar*, 2015-Ohio-143, ¶ 8 (9th Dist.).

**{¶22}** Homeowners argue that Orion did not support its motion for summary judgment with any proper Civ.R. 56(C) evidence. According to Homeowners, Orion filed uncertified transcripts of their depositions and a set of exhibits. The exhibits were not attached to the depositions. Nor were they incorporated by reference through a properly framed affidavit. Homeowners objected to the transcripts as well as the exhibits. They argue that the trial court could not consider any of Orion's evidence because it did not comply with Civ.R. 56(C) and they objected to its admission.

**{¶23}** The record does not support Homeowners' assertion that Orion relied on uncertified transcripts. It shows that Orion filed three separate sets of transcripts from Homeowners' depositions. The first set accompanied its motion for summary judgment. Those transcripts were certified by a court reporter. The second set accompanied its brief in opposition to Homeowners' motion for summary judgment. Those transcripts also were certified by a court reporter. Finally, Orion filed a third set of transcripts after Homeowners objected and moved to strike its evidence. Those transcripts were certified by a court reporter and contained additional, notarized

certifications. The additional certifications provided that Homeowners had been notified of the preparation of their transcripts and had not signed errata pages within thirty days. Orion filed all three sets of transcripts before the trial court ruled on its motion for summary judgment. The trial court refused to strike them, finding the transcripts had been certified. Homeowners have not shown that the court erred in its ruling. *See King* at ¶ 16-22. Upon review, the record supports the conclusion that the trial court properly considered the deposition transcripts. Accordingly, Orion set forth evidence in support of its motion.

{¶24} To the extent Homeowners challenge the admission of Orion's exhibits at the summary judgment stage, we need not decide that issue to resolve this assignment of error. As explained below, Orion's challenge to the CSPA counterclaim was based primarily on an issue of law, not facts. Homeowners' depositions supplied all the facts necessary to resolve their counterclaim. Accordingly, even if the trial court erred by admitting Orion's exhibits, that error was harmless, and this Court will not address it. *See* Civ.R. 61.

{¶25} The trial court found that Orion and Homeowners engaged in a transaction involving a home construction service contract. Thus, it found that their contract was governed by the HCSA, not the CSPA. Homeowners argue the trial court erred in its legal conclusion. They argue that, at the time they contracted with Orion, the HCSA did not apply to contracts for home repairs, remodels, or rebuilds.[3] According to Homeowners, the CSPA governed those contracts while the HCSA applied to contracts for new construction.

{¶26} As noted, the General Assembly enacted the HCSA in 2012. When it was enacted, the HCSA defined a "[h]ome construction service" as "the construction of a residential building."

---

[3] We would note that Homeowners brought a counterclaim against Orion under the HCSA as well as the CSPA.

Former R.C. 4722.01(B). It defined a residential building as "a one-, two-, or three-family dwelling and any accessory construction incidental to the dwelling." Former R.C. 4722.01(F). It did not define the word "construction." *See id.*

{¶27} The Fifth and the Eleventh Districts have held that the HCSA, as originally enacted, only applied to contracts for new home construction, not repairs, remodels, or renovations. *See A1 Heating and Cooling, Inc. v. Thomas*, 2024-Ohio-109, ¶ 55-57 (5th Dist.); *Beder v. Cerha Kitchen and Bath Design Studio, LLC*, 2022-Ohio-4463, ¶ 7-18 (11th Dist.). *See also Estate of Tomlinson v. Mega Pool Warehouse, Inc.*, 2023-Ohio-229, ¶ 17-27 (5th Dist.), *rev'd on other grounds*, 2024-Ohio-1065. They based their rulings on the Supreme Court's decision in *State ex rel. Celebrezze v. Natl. Lime & Stone Co.*, 68 Ohio St.3d 377 (1994). In that case, the Supreme Court had to decide whether the Ohio Administrative Code required a mineral producer to secure a permit before installing "[a] like-kind replacement" of a single piece of equipment within "a complex manufacturing operation involving the emission of an air contaminant. . . ." *State ex rel. Celebrezze* at syllabus. The Supreme Court found that the Administrative Code defined the term "installation" as it applied to the installation of an air contaminant source or treatment works. *Id.* at 380-382, citing Adm.Code 3745-31-01(I). The administrative code defined "installation" as "'to construct, erect, locate, or affix an air containment source or any treatment works.'" *State ex rel. Celebrezze* at 380, quoting Adm.Code 3745-31-01(I). Because the administrative code did not define the word "construct," the Supreme Court looked to the Sixth Edition of Black's Law Dictionary. *State ex rel. Celebrezze* at 382. The Supreme Court wrote:

> According to Black's Law Dictionary (6 Ed.1990) 542, "erect" and "construct" are synonymous terms. "Construct" is defined as "[t]o build; put together; make ready for use . . . [and] is distinguishable from 'maintain,' which means to keep up, to keep from change, to preserve." Further, "construction" is defined as ". . . [t]he *creation of something new*, as distinguished from the repair or improvement of something already existing. . . ."

(Alterations in original and internal citations omitted.) *Id.* The foregoing definitions and other considerations led the Supreme Court to conclude that "[a] like-kind replacement" of a single piece of equipment was not an "installation" for purposes of Adm.Code 3745-31-02(A). *Id.* at syllabus.

{¶28} The Fifth and Eleventh Districts relied on the foregoing definitions of "construct" and "construction" when interpreting that term within the meaning of the HCSA. *See A1 Heating and Cooling, Inc.* at ¶ 57; *Beder* at ¶ 13. Consequently, they found the HCSA, as originally enacted, did not govern contracts for home repairs, remodels, or renovations. Homeowners argue the trial court ought to have relied on those same definitions. Instead, it relied on a vocabulary website to supply the ordinary meaning of the word "construction." That definition included both the building of new structures and the repair of old ones. Relying on that broader definition, the trial court found the contract between Orion and Homeowners was a home construction services contract. Thus, it concluded that the HCSA rather than the CSPA applied to their contract. Homeowners argue the trial court erred as a matter of law when it ignored the Supreme Court's interpretation of "construct" and "construction" as well as the persuasive authority of the Fifth and Eleventh Districts.

{¶29} Upon review, we cannot conclude the trial court erred when it found the CSPA did not apply to the contract between Orion and Homeowners. The Supreme Court's decision in *State ex rel. Celebrezze* dealt with the interpretation and application of a specific provision of the Ohio Administrative Code. 68 Ohio St.3d 377 at syllabus. The Supreme Court only considered definitions of the words "construct" and "construction" for the purpose of defining the term "installation" within that provision of the administrative code. *Id.* at 382. The Supreme Court acknowledged that "construct" could simply be defined as "'[t]o build; put together; make ready for use . . . .'" *Id.* at 382, quoting Black's Law Dictionary (6th Ed. 1990). Its decision to apply

the more limited definition of "construction" stemmed from (1) its interpretation of other words used in the administrative code section at issue, (2) the reasonableness of that interpretation, and (3) the "considerable deference" it had to afford the Ohio Environmental Protection Agency's interpretation of its own rules. *Id.* at 382. This Court is not convinced the Supreme Court intended its decision to supply a singular definition to the term "construction" for all future cases, regardless of circumstance. Moreover, the "construction" definition upon which the Supreme Court relied became obsolete in 1999. Since that time Black's Law Dictionary has defined "construction" as "[t]he act of building by combining or arranging parts or elements; the thing so built." *Black's Law Dictionary* (7th Ed. 1999); *Black's Law Dictionary* (12th Ed. 2004).

{¶30} The Black's Law Dictionary definition of "construction" in effect since 1999 as well as the standard definition of the word support the conclusion that it encompasses more than just new construction. *See id.*; *Merriam-Webster's Collegiate Dictionary* (11th Ed. 2003) (defining "construct" and "construction" without distinguishing between new construction and repairs, remodels, and renovations). While Former R.C. 4722.01 did not define "construction," it did provide that a "[h]ome construction service contract" was a contract "between an owner and a supplier to perform home construction services . . . ." R.C. 4722.01(C). The statute defined the term "[o]wner" as follows:

> "Owner" means the person who contracts with a home construction service supplier. "Owner" may include the owner of the property, *a tenant who occupies the dwelling unit on which the home construction service is performed*, or a person the owner authorizes to act on the owner's behalf to contract for a home construction service, and any other person who contracts for a home construction service.

(Emphasis added.) Former R.C. 4722.01(E). Were the HCSA limited to new construction, the italicized portion of that definition would not make sense. A tenant could not occupy a dwelling unit that had yet to be built.

{¶31} Notably, when the house bill that eventually became Former R.C. 4722.01 was introduced at General Assembly, it restricted "home construction services" to "the construction of a new residential building or the substantial rehabilitation of a residential building. . . ." 2011 Am.H.B. No. 383. It also provided a definition for "substantial rehabilitation." *Id.* That restriction and definition were not included when the General Assembly enacted Former R.C. 4722.01. Thus, the legislature chose not to adopt a narrower definition of "home construction services."

{¶32} A broader interpretation of "construction" serves the legislature's stated purpose in enacting the HCSA, which was "to make changes relative to residential construction and the [CSPA] and to establish laws governing the practices of home construction service suppliers." Am.Sub. H.B. 383, 2012 Ohio Laws File 107. This Court also would note that the legislature recently amended R.C. 4722.01. That amendment went into effect in September 2024. It revised the definition of "[h]ome construction service." The current version of the statute now defines the phrase as "the construction of a residential building, including the creation of a new structure and the repair, improvement, remodel, or renovation of an existing structure." R.C. 4722.01(B). While inapplicable to the contract at issue, the amendment eliminates any doubt as to whether the legislature intended the HCSA to apply only to new construction.

{¶33} This Court must conclude that the trial court did not err as a matter of law when it found that the CSPA did not apply to the contract between Orion and Homeowners. Because their transaction involved a home construction service contract, it was not a consumer transaction. *See* R.C. 1345.01(A). Accordingly, only the HCSA applied to it.

{¶34} Homeowners also argue the trial court erred when it found their contract with Orion was a cost-plus contract. Yet even if the trial court erred in that regard, its ruling would have no bearing on Homeowners' CSPA counterclaim. Former R.C. 4722.01(C) defined a "[h]ome

construction service contract" as "a contract between an owner and a supplier to perform home construction services, *including services rendered based on a cost-plus contract*, for an amount exceeding twenty-five thousand dollars." (Emphasis added.). Orion set forth evidence that its contract with Homeowners was for home construction services exceeding $25,000. Even if the contract was not a cost-plus contract, it still met the definition of a "[h]ome construction service contract" under Former R.C. 4722.01(C). Thus, any error the court made in classifying the contract as a cost-plus contract was harmless insofar as it concerned Homeowners' CSPA counterclaim. *See* Civ.R. 61.

{¶35} Upon review, Homeowners have not shown the trial court erred by awarding Orion summary judgment on their CSPA counterclaim. Accordingly, their first assignment of error is overruled.

Slander of Title

{¶36} "Slander of title is a tort action premised upon defamation of real property . . . ." *Gasper v. Bank of America, N.A.*, 2019-Ohio-1150, ¶ 36 (9th Dist.). "To prove slander of title, the plaintiff must show that a false statement was made, published maliciously, and the false statement resulted in a special pecuniary loss to the property holder." *Baker v. Fish*, 2000 WL 1783577, *5 (9th Dist. Dec. 6, 2000). "A mechanic's lien which falsely and maliciously casts a cloud upon a title may give rise to a cause of action for slander of title." *Smith Elec. v. Rehs*, 1998 WL 103334, *3 (9th Dist. Feb. 18, 1998).

{¶37} In moving for summary judgment against Homeowners, Orion argued there was no evidence tending to show it acted in a false, malicious, or reckless manner when it filed its mechanic's lien. When deposed, Homeowners admitted Orion performed work at their property. They admitted that Orion moved the tree that damaged their property, placed tarps on their

property, installed new subflooring, reframed their living room, constructed and installed new trusses, and installed a new roof. Ms. Kaeka testified that she and Ms. Latham eventually became dissatisfied with Orion's work and sent Orion a letter. The letter ordered Orion to place a hold on its work and forward any invoices. The letter also explained why Homeowners were dissatisfied with the work Orion had performed. Ms. Kaeka admitted that Orion's CEO had responded to the letter. The response addressed each of the concerns Homeowners had and included an invoice for over $58,000. Homeowners admitted that they did not pay the invoice. Indeed, they admitted that they never made a single payment to Orion.

{¶38} In their respective depositions, Homeowners acknowledged that they never tried to contact Orion following the responsive letter they received from its CEO. They agreed that Orion later sent them a notice of its intent to file a mechanic's lien on their property due to nonpayment. Still, Homeowners did not contact Orion. Ms. Kaeka testified that someone from Orion also left them a voicemail message, but they never returned the call. When Homeowners did not respond to Orion's letter, voicemail, or notice of intent, it filed its mechanic's lien. Orion argued that reasonable minds could only conclude it had a valid basis for doing so.

{¶39} Homeowners argued summary judgment was inappropriate because there were genuine issues of material fact for trial. They argued there was a factual dispute as to whether Orion had a legitimate lien or had falsely claimed it was owed over $58,000. According to Homeowners, Orion billed them for work it knew it had not performed and materials it knew it had not installed. For example, Ms. Kaeka averred in an affidavit that Orion had charged them for the replacement of a rafter it had not actually replaced. She also testified in her deposition that Orion had billed them for plywood subflooring but had then used a different, cheaper material. Homeowners testified about damage their property sustained because Orion failed to properly

safeguard it from rain and moisture. It was their position that Orion was not entitled to any money because the cost of redoing its work and remedying the damage it caused exceeded the amount it claimed it was owed. Thus, they argued Orion lacked a legitimate basis to file a lien.

{¶40} The trial court found Orion was entitled to summary judgment because a dispute over the specific amount of money it was owed would not invalidate its lien. The court relied on the following proposition of law: "a mechanic's lien in an amount in excess of the actual amount due is not, for that reason, rendered invalid."[4] *Tucker Const., Inc. v. Kitchen*, 1995 WL 89431, *3 (9th Dist. Mar. 1, 1995), citing *Thomas v. Huesman*, 10 Ohio St. 152, 159 (1859). The court found there was no dispute that Orion had purchased materials for Homeowners' property, had performed work there, and was never paid. Consequently, it found reasonable minds could only conclude Orion had not made a false or malicious statement when it filed its lien.

{¶41} On appeal, Homeowners argue the trial court erred by awarding summary judgment to Orion because there were genuine issues of fact for trial regarding the legitimacy of its lien. They argue that Orion knew it was owed nothing but nonetheless filed its lien. According to Homeowners, they produced evidence tending to show the lien was false and filed with malice or reckless disregard for its falsity. Thus, they argue that a jury ought to have decided their counterclaim for slander of title.

{¶42} Initially, we note that Homeowners have cited trial testimony in support of their argument that the trial court erred by awarding Orion summary judgment. This Court cannot consider that testimony. "'Our review of a summary judgment is limited solely to that evidence

---

[4] The trial court quoted *Thompson Thrift Construction v. Lynn*, 2017-Ohio-1530 (5th Dist.) for this proposition of law, but the quote does not appear in *Thompson Thrift Construction*. The quote appears in *Tucker Construction, Inc.*, which the *Thompson* Court cited in its opinion. *See Thompson Thrift Construction* at ¶ 79.

that was before the trial court at the time of its decision.'" *Schlegel v. Summit County*, 2021-Ohio-3451, ¶ 30 (9th Dist.), quoting *Charleston v. Vernay Laboratories, Inc.*, 1989 WL 68412, *3 (2d Dist. June 22, 1989). Because trial testimony was not available to the trial court at the time it awarded summary judgment to Orion, it has no bearing on the trial court's decision.

**{¶43}** Upon review, we cannot conclude the trial court erred when it awarded summary judgment to Orion on the counterclaim for slander of title. The undisputed evidence showed that Orion filed its lien after it purchased materials, performed work for Homeowners, responded in writing to their concerns, complied with their request for an invoice, sent them a notice of intent to file a lien, left them a voicemail message about the lien, and never received any response or payments. Even if Homeowners ultimately felt Orion was not entitled to any money, there was no evidence they communicated that fact to Orion before it filed its lien. They specifically asked Orion to provide them with an invoice; an act that would be incongruous with a position that Orion was owed nothing. After Orion responded to their request, Homeowners failed to initiate further contact with Orion or respond to its attempts at communication. Viewing the evidence in a light most favorable to Homeowners, no rational trier of fact could conclude that Orion acted in a false, malicious, or reckless manner when it filed its mechanic's lien. *See Baker*, 2000 WL 1783577, at *5 (9th Dist.). Accordingly, the trial court did not err by awarding it summary judgment on Homeowners' claim for slander of title. Homeowners' fourth assignment of error is overruled.

### HOMEOWNERS' ASSIGNMENT OF ERROR II

> THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING ORION'S MOTION IN LIMINE, EXCLUDING EVIDENCE, AND REFUSING TO SUBMIT CONSUMERS' HOME SOLICITATION SALES ACT COUNTERCLAIM TO THE JURY.

**{¶44}** In their second assignment of error, Homeowners argue the trial court erred when it granted Orion's motion in limine and excluded evidence in support of their HSSA counterclaim.

Homeowners argue Orion's motion was, in effect, a motion for summary judgment. They argue the court ought to have denied the motion on procedural grounds. They also argue the court erred by not submitting their counterclaim to the jury because it was valid on its merits. For the following reasons, we reject their assignment of error.

**{¶45}** "[T]o demonstrate reversible error on appeal, an appellant has the burden to demonstrate error as well as prejudice resulting from that error." *In re Estate of House*, 2023-Ohio-4348, ¶ 13 (9th Dist.). Errors are only prejudicial if they affect a litigant's substantial rights. *See* Civ.R. 61. Harmless errors or defects must be disregarded "at every stage of the proceeding . . . ." *Id.*

**{¶46}** As previously noted, the trial court awarded Orion summary judgment on Homeowners' counterclaim for breach of the CSPA. It concluded that Orion and Homeowners had engaged in a transaction involving a home construction service contract, not a consumer transaction. We have already determined that the trial court did not err in its ruling. *See* Discussion of Assignment of Error I, *supra*.

**{¶47}** Following the trial court's summary judgment ruling, Orion filed a motion in limine. It sought to exclude from trial any evidence or reference to a violation of the HSSA. Although the trial court granted the motion in limine, it did so based on its prior summary judgment ruling. It specifically found that its prior legal conclusion (i.e., that there had not been a "consumer transaction") rendered Homeowners' counterclaim under the HSSA moot.

**{¶48}** Homeowners argue the trial court should have construed Orion's motion in limine as a motion for summary judgment. They argue the court should have denied the motion because it was not supported by Civ.R. 56 evidence. They also argue that they presented a valid HSSA counterclaim. According to Homeowners, the solicitation stage of their exchange with Orion could

still qualify as a consumer transaction, even if the work under contract did not. Homeowners insist there was evidence of a HSSA violation, so the jury should have been instructed on that counterclaim. Because Orion never moved for summary judgment or a directed verdict on that counterclaim, Homeowners argue the trial court failed to resolve it.

{¶49} To the extent Homeowners argue the trial court failed to resolve their HSSA counterclaim, the record does not support that conclusion. The record reflects that the court found the counterclaim moot. It, therefore, expressly disposed of that counterclaim. Moreover, even if the court should not have made its ruling in the context of a motion in limine, Homeowners have not shown that its error affected their substantial rights. *See* Civ.R. 61.

{¶50} The HSSA is contained in Chapter 1345 of the Revised Code, meaning it falls within the purview of the CSPA. *See* R.C. 1345.21 et seq. Indeed, this Court has held that "[a] violation of the HSSA constitutes a violation of the CSPA." *Brunke v. Ohio State Home Servs., Inc.*, 2015-Ohio-2087, ¶ 17 (9th Dist.), citing R.C. 1345.28. The trial court determined, as a matter of law, that the CSPA did not apply to the Contract. That determination led the court to conclude that the HSSA counterclaim was moot. Homeowners have not explained how the court's legal determination would have changed had it considered Orion's motion on other procedural grounds. *See* App.R. 16(A)(7). Their position that the solicitation stage of their agreement with Orion was still subject to the HSSA, and therefore the CSPA, is tenuous at best. The CSPA applies to all stages of a consumer transaction, including the solicitation stage. *See* R.C. 1345.01. By definition, a transaction involving a home construction service contract is not a "[c]onsumer transaction." *See id.* The legislature did not indicate that the CSPA still applies to the solicitation stage of a transaction involving a home construction services contract. *See id.* Further, the HCSA sets forth its own requirements for the contents of written contracts, prohibitions against certain conduct,

and remedies for violations of its provisions. *See* R.C. 4722.02, 4722.03, and 4722.08. Homeowners have not shown that, had the trial court recast Orion's motion as one for summary judgment, the outcome of the proceedings would have been different. *See* Civ.R. 61. Accordingly, their second assignment of error is overruled.

HOMEOWNERS' ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN GRANTING ORION'S MOTION IN LIMINE EXCLUDING EVIDENCE OF HOME CONSTRUCTION SERVICE SUPPLIERS ACT.

{¶51} In their third assignment of error, Homeowners argue the trial court erred when it granted Orion's motion in limine and excluded certain evidence in support of their HCSA counterclaim. Homeowners argue Orion's motion was, in effect, a motion for summary judgment. According to Homeowners, Orion failed to present evidence in support of its motion. For the following reasons, we reject their assignment of error.

{¶52} As previously noted, a reversible error is one for which an appellant has demonstrated both error and resulting prejudice. *In re Estate of House*, 2023-Ohio-4348, at ¶ 13 (9th Dist.). Errors are only prejudicial if they affect a litigant's substantial rights. *See* Civ.R. 61. Harmless errors or defects must be disregarded "at every stage of the proceeding . . . ." *Id.*

{¶53} We begin with a brief recitation of the statutory provisions relating to Homeowners' HCSA counterclaim. The HCSA defines a home construction service contract as one "between an owner and a supplier to perform home construction services, including services rendered based on a cost-plus contract, for an amount exceeding twenty-five thousand dollars." R.C. 4722.01(C). It requires home construction service contracts to be in writing. R.C. 4722.02(A) and 4722.03(A)(1). Importantly, however, the HCSA treats cost-plus contracts differently than other home construction service contracts. Home construction service contracts generally must comply with

the writing requirements set forth in R.C. 4722.02(A) and (B). They must include certain information such as the seller's contact details, a general description of the work to be performed, the anticipated start and end dates, the total estimated cost of the service, and notice requirements regarding excess costs. R.C. 4722.02(A) and (B). Yet, cost-plus contracts are not subject to those requirements. The HCSA specifically exempts them from the writing requirements that apply to other home construction service contracts. *See* R.C. 4722.02(C) and 4722.03(B). A cost-plus contract is one "entered into between an owner and a home construction service supplier under which payment to the supplier is based on the cost of a product plus the supplier's rate for labor to install the product plus an agreed percentage of profit or a stipulated fee." R.C. 4722.01(A).

{¶54} When Orion moved for summary judgment on Homeowners' counterclaim under the CSPA, it argued that the Contract was a transaction for home construction services, not a consumer transaction. Homeowners filed a brief in opposition. In doing so, they included an argument that the Contract was not one for home construction services because it did not comply with the HCSA's writing requirements (i.e., those contained in R.C. 4722.02(A)). Homeowners also argued that the Contract was not exempt from those requirements because it was not a cost-plus contract. Orion replied to Homeowners' brief in opposition. Its reply included arguments and evidence as to why the Contract was, in fact, a cost-plus contract under the HCSA. When the trial court issued its summary judgment ruling in favor of Orion on the CSPA counterclaim, it included a finding that the Contract was a cost-plus contract. It also specifically found that the writing requirements set forth in R.C. 4722.02(A) did not apply because the Contract was a cost-plus contract.

{¶55} Following the trial court's summary judgment ruling, Orion filed a motion in limine. It sought to exclude evidence of any alleged violations of R.C. 4722.02(A), 4722.02(B),

and 4722.03 to the extent the latter required written notifications regarding excess costs. Orion argued that none of those writing requirements applied because the Contract was a cost-plus contract. It relied on the trial court's prior summary judgment ruling to that effect. The trial court agreed with that assertion based on its prior ruling. It, therefore, granted the motion in limine and refused to submit that portion of Homeowners' HCSA counterclaim to the jury. The court only allowed the jury to decide whether Orion had violated other aspects of the HCSA.

{¶56} Homeowners argue the trial court erred when it granted Orion's motion in limine. They argue the motion was tantamount to a motion for summary judgment. According to Homeowners, the trial court should have denied the motion because it was not supported by evidence. They argue that the evidence showed the Contract was not a cost-plus contract.

{¶57} Upon review, we must conclude Homeowners' argument fails for several reasons. First, a portion of their argument directs this Court to refer to an argument set forth in a different assignment of error. This Court has repeatedly held that an appellant "cannot 'incorporate the arguments contained in the other assignments of error to support a different assignment of error.'" *State v. Calhoun*, 2021-Ohio-1713, ¶ 24 (9th Dist.), quoting *State, ex rel. Midview Local School Dist. Bd. of Edn. v. Ohio School Facilities Comm.*, 2017-Ohio-6928, ¶ 29 (9th Dist.). Second, even if the trial court ought to have recast Orion's motion in limine as one for summary judgment, Homeowners have not explained how its failure to do so affected their substantial rights. *See* Civ.R. 61. The trial court determined, as a matter of law, that the parties had a cost-plus contract. It made that determination at the summary judgment stage upon consideration of the evidence presented therein. Indeed, it was Homeowners who brought that issue to the attention of the court at the summary judgment stage. Homeowners have not explained how the court's legal determination would have changed had it construed Orion's motion in limine as another motion

for summary judgment. Finally, and relatedly, to the extent Homeowners argue that Orion's motion lacked merit because the parties did not have a cost-plus contract, the evidence they cite was introduced at trial. This Court cannot consider that evidence as it was not before the trial court at the time it made its ruling. *See Schlegel*, 2021-Ohio-3451, at ¶ 30 (9th Dist.). For the foregoing reasons, Homeowners' third assignment of error is overruled.

ORION'S ASSIGNMENT OF ERROR I

THE TRIAL COURT ERRED BY EXCLUDING EVIDENCE THAT THE DAMAGES ALLEGEDLY SUSTAINED BY [HOMEOWNERS] AS A RESULT OF [ORION]'S BREACH OF CONTRACT WERE FULLY PAID FOR BY THE INSURANCE PROCEEDS RECEIVCE (sic) BY [HOMEOWNERS.]

**{¶58}** In its first assignment of error, Orion argues the trial court erred when it excluded evidence of the insurance proceeds Homeowners received. For the following reasons, we reject its assignment of error.

**{¶59}** "The decision to admit or exclude evidence lies in the sound discretion of the trial court. Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *Wells v. Wells*, 2012-Ohio-1392, ¶ 42 (9th Dist.), quoting *Jones v. Jones*, 2011-Ohio-4393, ¶ 7 (9th Dist.). The term abuse of discretion is used to indicate that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶60}** A trial court may exclude relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Evid.R. 403(A). "[T]he exclusion of relevant evidence under Evid.R. 403(A) is even more of a judgment call than determining whether the evidence has logical relevance in the first place." *Chambers v. Lee*, 2014-Ohio-4651, ¶ 6 (9th Dist.), quoting *State v. Yarbrough*, 2002-Ohio-2126, ¶ 40.

**{¶61}** Homeowners filed a motion in limine, seeking to exclude any argument or mention of insurance benefits or payments they received to repair their home. They argued that evidence was irrelevant, unduly prejudicial, and likely to confuse the jury. Orion responded in opposition. It argued the insurance evidence was relevant to Homeowners' counterclaim for breach of contract. It argued the evidence would show Homeowners had not sustained actual damages because their insurance payments had prevented them from incurring any out-of-pocket expenses. Upon review, the trial court rejected Orion's argument. The court found that Homeowners' damages were not limited to the amount they paid out of pocket. It found the insurance evidence would be unduly prejudicial if offered to prove they had not suffered damages. Accordingly, it granted the motion in limine.

**{¶62}** At the conclusion of trial, the trial court instructed the jury that, if Homeowners prevailed on their counterclaim for breach of contract, they were "entitled to damages in the amount sufficient to place them in the same position in which they would have been if the contract had been fully performed . . . to the extent that the damages [were] reasonably certain and reasonably foreseeable." The court instructed the jury that they could award damages that were the natural and probable result of the breach. It also instructed the jury that they could award damages for the loss of use of the property for an eleven-month period due to the breach. The court defined loss of use as "the reasonable value of the use of [the] property during the period reasonably necessary for making repairs or restoring it to a usable condition." Finally, the court instructed the jury that Homeowners could recover damages for serious emotional distress. The trial court specifically instructed the jury that, "in determining damages for either party, you may not consider whether insurance paid for any alleged damages sustained by either party."

{¶63} The jury ultimately awarded Homeowners $118,848.37 in damages for their breach of contract counterclaim. The court asked the jury to complete an interrogatory regarding that damage award. It asked the jury to identify how much of that award represented damages for serious emotional distress. The jurors indicated that $0 of the award represented damages for serious emotional distress. No additional interrogatories for the damage award were submitted.

{¶64} Following the verdict, Orion requested a setoff hearing. It argued that the damages the jury had awarded on the breach of contract counterclaim had already been paid by Homeowners' insurance. Orion also expressed its intention to move for judgment notwithstanding the verdict on that basis. The court set a briefing schedule. Orion then filed a motion for judgment notwithstanding the verdict, or in the alternative, a motion for a new trial. Homeowners filed a reply.

{¶65} Upon review, the trial court denied Orion's motion. Relevant to this appeal, it found Orion's arguments speculative and lacking in evidentiary support. The court noted that Homeowners had sought to recover for more than just the amount it had cost to repair their home. They also had sought damages for the loss of use of the property, the fact that they had to postpone their plans to start a family, expenses they incurred from travel and renting an apartment, and expenses they incurred boarding their pets. The court noted that Orion had not asked to submit any interrogatories to itemize the jury's damages award. The only information known about the award was that it did not include damages for serious emotional distress. The court declined to speculate as to the grounds for the award. It also found that Orion had failed to proffer evidence of the insurance payments at trial. Without that evidence, the court reasoned, it was unable to determine how much insurance money Homeowners received and whether that money had made

them "whole" with regard to all the damages they claimed. The court concluded that Orion had not shown it was entitled to judgment notwithstanding the verdict, a new trial, or a set-off.

{¶66} Orion argues the trial court abused its discretion when it refused to allow it to introduce evidence about the insurance proceeds. Orion argues the insurance payments were highly relevant and, despite the trial court's preliminary ruling, Homeowners opened the door to that evidence when one of them testified about their insurance adjuster. It argues that the insurance evidence was not barred by the collateral source rule because that rule only applies in tort actions. It further argues that the reason it did not proffer that evidence at trial was that the trial court specifically said it could raise the argument in a motion for judgment notwithstanding the verdict. According to Orion, the court's ruling allowed Homeowners to receive a windfall.

{¶67} Even if this Court were to assume that the trial court erred by excluding the insurance evidence and that Orion did not have to proffer the evidence at trial, Orion has not shown that the court's error prejudiced its substantial rights. *See* Civ.R. 61. The jury was only asked to complete one interrogatory related to its damage award. The only information to be gleaned from that interrogatory was that the award was not attributable to severe emotional distress. Orion did not request any additional interrogatories to test that award. Because it did not do so, "the breakdown of the damages offered by [Orion] is speculative . . . ." *Black v. Stouffer Realty, Inc.*, 2013-Ohio-5723, ¶ 14 (9th Dist.). The jury heard evidence about the cost of repairing Homeowners' property. Yet, they also heard evidence that Homeowners lost the use of their property for a substantial period of time, postponed long-term plans, incurred costs related to travel and lodging and the boarding of their pets, and underwent substantial inconvenience. It is impossible to know what portion of the jury's award, if any, was attributable solely to the repair cost. "In the absence of interrogatories, an appellate court may not overturn a jury's damage award

unless it is apparent from the record that the award was the result of passion or prejudice." *Id.* Upon review, we cannot conclude that passion or prejudice is evident from the record. Orion has not shown that, had the jury been permitted to consider the insurance payments in awarding damages, the result of the proceedings would have been different. *See* Civ.R. 61. Accordingly, its first assignment of error is overruled.

ORION'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ERRED BY EXCLUDING [ORION]'S EXPERT WITNESS' DEMONSTRATIVE EXHIBITS DETAILING THE ROOF PITCH OF [HOMEOWNERS'] RESIDENCE AND ITS CALCULATION[.]

{¶68} In its second assignment of error, Orion argues the trial court abused its discretion when it refused to admit four demonstrative exhibits used by Orion's expert at trial. For the following reasons, we reject its argument.

{¶69} "The decision to admit or exclude evidence lies in the sound discretion of the trial court. Absent an issue of law, this Court, therefore, reviews the trial court's decision regarding evidentiary matters under an abuse of discretion standard of review." *Wells*, 2012-Ohio-1392, at ¶ 42 (9th Dist.), quoting *Jones*, 2011-Ohio-4393, at ¶ 7 (9th Dist.). The term abuse of discretion is used to indicate that the trial court's attitude was unreasonable, arbitrary or unconscionable. *Blakemore*, 5 Ohio St.3d at 219.

{¶70} A hotly contested issue at trial was whether Orion properly calculated the slope of the roof in Homeowners' family room. The roof was destroyed by the tree that fell during the storm such that only portions of the outside trusses and broken pieces of the other trusses remained. William Shirkey, the director of estimates at Orion, testified that Orion used satellite imagery software to generate measurements for the missing roof and create an initial repair estimate. That software and the initial repair estimate had the interior trusses for the roof at 6/12 slope. Mr.

Shirkey also testified, however, that slope must be confirmed by an outside source. He testified that Orion consulted with a representative from a truss company and hired an architect to create blueprints. He testified that both the representative and the architect found the 6/12 slope measurement was incorrect.

{¶71} Jeff Barber testified as the architect Orion retained. He testified that he performed field measurements and reviewed listing pictures that were posted on the internet before the house sold. Mr. Barber believed the interior trusses for the roof were a 3.5/12 slope. He was adamant that the original trusses could not have been a 6/12 slope. He explained that a 6/12 slope would result in a far steeper ceiling than the original ceiling. He confirmed that the listing pictures were consistent with a 3.5/12 slope not a 6/12 slope. Nevertheless, he acknowledged that he had been unable to perform field measurements on the interior trusses because they had been destroyed by the tree.

{¶72} Yvette Oswalt testified as the truss company representative. She took measurements at the scene but testified that she was hindered by the fact that Orion had already demolished the back wall of the family room and removed debris. She was able to measure an outside truss from a remanent she found at the scene but not an inside truss. She testified that she ultimately used a 3.5/12 slope for the interior trusses to be consistent with the architectural plans. She agreed that the difference between a 3/12 slope and a 6/12 slope would be significant.

{¶73} Homeowners introduced listing pictures of the original family room through their realtor. The pictures showed a high cathedral ceiling, but the realtor acknowledged that listing pictures can be misleading due to wide-angle lenses distorting the angles and shape of a room. She testified that she did not know what the actual slope of the trusses had been before they were destroyed. Nevertheless, she saw the family room ceiling in person before it was destroyed. It

was her opinion that the height of the replacement ceiling Orion installed did not match the height of the original ceiling.

{¶74} Homeowners also testified that the height of the ceiling Orion installed did not match the height of the original ceiling. They emphasized that the height of the original ceiling was a key feature in their decision to purchase the home. According to Homeowners, the ceiling Orion installed was noticeably lower than the original ceiling. They testified that they had a second company replace the roof that Orion installed. That company used a 6/12 slope for the interior trusses. Homeowners testified that the new ceiling with the 6/12 slope looked the same as the original ceiling.

{¶75} Both Homeowners and Orion presented expert testimony. Brian Reader testified for Homeowners as an expert in architecture. He testified that he reviewed pictures of the house before and after it was damaged. He also visited the house after Homeowners had a new company tear down Orion's roof and install a roof with a 6/12 interior slope. Mr. Reader testified that pictures may distort an image, particularly if taken from an angle. Nevertheless, he testified that he was able to rely on certain pictures of the house to generate the original slope. Older pictures of the house allowed Mr. Reader to count the rows of siding on the home, estimate the height of each row, and calculate the height of the roof. Additionally, pictures of the original and replacement king posts allowed him to compare the two. Mr. Reader testified that a king post is the center post in a truss. He was shown a picture of the king post from an original, broken truss and a picture of the king post Orion used in its replacement. He testified that the original king post was much longer, which would have resulted in a steeper slope. He estimated that the original slope was about 5/12.

{¶76}  Stephanie Osterholt, a senior forensic civil structural engineer, testified as an expert for Orion.   She testified that she never uses satellite imagery software to calculate roofing angles because field measurements are superior.  Before forming an opinion on this matter, she reviewed photographs of the house, the handwritten measurements from Orion's architect (Mr. Barber), the measurements performed by the truss company representative (Ms. Oswalt), and other expert reports.  It was her opinion that the slope of the original interior trusses was between 3.5/12 and 4.5/12.  She testified that the original slope was never 6/12.  Relevant to this appeal, she testified about Exhibits 47, 49, 50, and 51.

{¶77}  Exhibit 47 was described as a summary of Ms. Osterholt's calculations and the steps she took to arrive at those calculations.  It included the measurements taken by Mr. Barber and Ms. Oswalt.  The trial court allowed Orion to introduce the exhibit and argue it to the jury over objection.  Yet, the court refused to admit the exhibit at the conclusion of trial.  It concluded that the exhibit was essentially part of Ms. Osterholt's expert report.  Accordingly, it found the exhibit was not subject to admission.

{¶78}  Exhibit 49 was described as a photograph of the back of the house.  It included text boxes with commentary from Ms. Osterholt.  The text explained how she made her measurements of various areas.  The same photograph of the back of the house was admitted as a different exhibit without the text boxes.   The trial court excluded Exhibit 49 based on its inclusion of Ms. Osterholt's commentary.

{¶79}  Exhibit 50 was described as a hand sketch that Mr. Barber created when he visited the house to take measurements.  It included text boxes with commentary from Ms. Osterholt.  The court refused to submit the exhibit to the jury due to the inclusion of the text boxes.

{¶80} Exhibit 51 was described as a series of three Google Earth images. They showed photos of Homeowners' house before the tree fell, after Orion replaced the roof, and after a second company replaced the roof again. The exhibit included colored lines drawn by Ms. Osterholt, drawing attention to the angle of the roof in each photo. The trial court refused to submit the exhibit to the jury due to the additions Ms. Osterholt had made to each image.

{¶81} Orion argues the trial court abused its discretion when it refused to admit Exhibits 47, 49, 50, and 51. It argues those exhibits were "central" to its defense because they simplified the complex technical testimony Ms. Osterholt offered on slope. According to Orion, the jury believed at least one of those exhibits was of paramount importance because it asked to see Exhibit 51 during deliberations. Orion argues it was prejudiced by the exclusion of the exhibits because, after the court allowed their introduction over objection, Orion assumed the court would admit them. It claims its faulty assumption led it to condense Ms. Osterholt's testimony. Orion argues that, had it known the exhibits would be excluded, it would have questioned Ms. Osterholt far more extensively.

{¶82} Initially, we note that Exhibits 47, 49, 50, and 51 are not in the appellate record. Homeowners urge this Court to reject Orion's assignment of error on that basis. Yet, error may be predicated upon a ruling to exclude evidence so long as the exclusion affected a substantial right and "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Evid.R. 103(A)(2). Exhibits 47, 49, 50, and 51 were introduced through testimony at trial, described therein, and discussed when Orion sought to admit them. Their substance is evident from the record, as is the trial court's basis for excluding them. Under these facts and circumstances, we must conclude that Orion has preserved its arguments for review.

**{¶83}** This Court finds no merit in Orion's assertion that a question from the jury serves as evidence of the paramount importance of at least one of its excluded exhibits. Even assuming a jury question could be used as evidence to test its verdict, *but see* Evid.R. 606(B), the record contains no evidence that the jury asked such a question. No questions were filed as part of the docket. Orion did not provide a transcript citation for the question it claims was asked. *See* App.R. 16(D). Further, this Court's independent review of the record has not revealed the existence of a question from the jury. Because Orion's assertion lacks evidentiary support, we reject it on that basis.

**{¶84}** Upon review, we need not determine whether the trial court abused its discretion by excluding Exhibits 47, 49, 50, and 51. That is because, even if the court erred by excluding the exhibits, Orion has not demonstrated resulting prejudice. *See* Civ.R. 61. Orion's argument that it was prejudiced by the exclusion of the exhibits is wholly speculative. *See In re X.H.*, 2022-Ohio-779, ¶ 9 (9th Dist.), quoting *In re A.M.*, 2012-Ohio-1024, ¶ 21 (9th Dist.) (entirely speculative arguments do not establish actual prejudice). The jury heard Ms. Osterholt give detailed testimony as to why she felt the correct slope of the original interior trusses was between 3.5/12 and 4.5/12. They were shown the exhibits at issue during her testimony. Ms. Osterholt led them through the measurements and visual representations she considered in forming her opinion. They heard her explain why the original slope could not have been a 6/12 slope. Her testimony was consistent with the testimony of Orion's architect (Mr. Barber) and, to at least some extent, the truss company representative (Ms. Oswalt). On the other hand, Homeowners' expert offered a different opinion. He gave detailed testimony as to why he felt the correct slope of the original interior trusses was about 5/12. Homeowners bolstered that testimony by offering their own opinions about the height differences in the roofs as well as the opinion of their realtor. The jury also was given pictures of

the house before the damage occurred and after its repair and pictures of the original and replacement king posts. The jury had a wealth of evidence before it and was tasked with deciding which of two diametrically opposed positions was correct. This Court is not convinced the jury would have reached a different result had it been able to examine Ms. Osterholt's exhibits during deliberations or had it heard additional testimony from her. There is no evidence that the jury rejected her opinion because they did not understand it. Orion's argument to that effect amounts to pure speculation. It has not shown that the exclusion of Exhibits 47, 49, 50, and 51 affected the outcome in this matter. Accordingly, Orion's second assignment of error is overruled.

## ORION'S ASSIGNMENT OF ERROR III

THE TRIAL COURT ERRED BY DENYING [ORION]'S MOTION FOR DIRECTED VERDICT ON [HOMEOWNERS'] BREACH OF CONTRACT CLAIM BECAUSE THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT [HOMEOWNERS] SUBSTANTIALLY PERFORM[ED] THEIR PAYMENT OBLIGATIONS PURSUANT TO THE CONTRACT[.]

**{¶85}** In its third assignment of error, Orion argues the trial court erred by denying its motion for directed verdict on Homeowners' counterclaim for breach of contract. We do not agree.

**{¶86}** "A motion for a directed verdict assesses the sufficiency of the evidence. . . ." *Kane v. O'Day*, 2007-Ohio-702, ¶ 18 (9th Dist.). It requires the trial court to construe the evidence most strongly in favor of the nonmoving party and decide whether "reasonable minds could come to but one conclusion upon the evidence submitted . . . ." Civ.R. 50(A)(4). If the nonmoving party "fails to present evidence on one or more essential elements of a claim, a directed verdict is proper." *Alonso v. Thomas*, 2021-Ohio-341, ¶ 53 (9th Dist.). "An appellate court reviews a trial court's ruling on a motion for a directed verdict de novo, as it presents an appellate court with a question of law." *Kane* at ¶ 18.

**{¶87}** "The elements for claim for breach of contract include the existence of a contract, performance by the plaintiff, breach by the defendant, and damage or loss to the plaintiff." *Skycasters, LLC v. Kister*, 2021-Ohio-4154, ¶ 42 (9th Dist.). "The doctrine of wrongful prevention of performance may be invoked to excuse the performance of a contractual obligation in a case where a party to the agreement has, in some manner, actively hindered or impeded the attainment of a material part of the bargain." *Carter v. University Park Dev. Corp.*, 2022-Ohio-3462, ¶ 52 (9th Dist.).

**{¶88}** The Contract called for Homeowners to be responsible for their insurance deductible and make three payments to Orion. The first payment was due upon commencement of the job, the second was due at the midpoint of the job, and the third was due upon substantial completion of the job. It is undisputed that Homeowners never paid Orion any money.

**{¶89}** Maureen Gentile, the president of Orion, testified that Homeowners chose not to sign an authorization for release of mortgage company information. That release would have allowed Orion to work directly with Homeowners' mortgage company to secure any payments from their insurance. Ms. Gentile testified that, without the release, "we can't talk to the mortgage company." Instead, Orion had to rely on Homeowners to communicate with their mortgage company and ensure Orion received its payments.

**{¶90}** Homeowners acknowledged that their insurance company issued them a check. However, the check included their mortgage company as a payee. Ms. Kaeka testified that the mortgage company required certain information from Orion before it would agree to release the insurance funds. She testified that she emailed Orion's office manager to request the documents the mortgage company needed for Orion's payments. According to Ms. Kaeka, she never received a response from the office manager. She was never copied on any email to the mortgage company,

and the mortgage company never informed her that it had received the required documents. She testified that she even tried to follow up with the office manager to ask if the required documents had been sent, but the office manager never responded.

{¶91} Ms. Gentile acknowledged that there are certain documents a mortgage company must receive before it can release funds. She also acknowledged that some of those documents would have been entirely within the control of Orion. She testified that she shared an email address with her office manager and was not aware that Homeowners had made any requests for the required documents. Yet, the office manager offered conflicting testimony. The office manager testified that she received an email from Homeowners, asking Orion to provide the required documents. She testified that she emailed the requested documents directly to the mortgage company. Although copies of other email exchanges were introduced into evidence, Orion did not introduce a copy of any email from the office manager to the mortgage company. Further, the office manager acknowledged that, because Homeowners had not signed an authorization for release of information, Orion and the mortgage company were not to have direct communication.

{¶92} Orion moved for a directed verdict on Homeowners' counterclaim for breach of contract. It argued that Homeowners had not proven their own performance under the Contract. Orion pointed to evidence that Homeowners had failed to adhere to the payment schedule set forth in the Contract. Homeowners acknowledged that they had not paid Orion but argued that Orion had prevented their performance. They argued that Orion had not provided them with the documents their mortgage company needed to release funds from the insurance company. The trial court found there was a material dispute and sufficient evidence existed for the counterclaim to be tried to the jury. Consequently, it denied Orion's motion. When the trial court instructed the jury, it included an instruction on the affirmative defense of prevention of performance. It

instructed the jury to find in favor of Homeowners if it determined that they failed to perform under the Contract because Orion "prevented them from completing the documentation to the mortgage company to allow release of payment."

{¶93} On appeal, Orion maintains that it was entitled to a directed verdict because Homeowners failed to prove their own performance under the Contract. It cites the Contract's payment schedule, Homeowners' refusal to sign an authorization for release of mortgage company information, and their failure to make a single payment. Orion did not address prevention of performance in its initial appellate brief. It included an argument about that defense in its reply brief after Homeowners raised it in their responsive brief. Orion argues that any claim it failed to provide information to the mortgage company was directly contrary to the testimony of its office manager. According to Orion, the office manager testified that she sent the information to the mortgage company, and Homeowners never produced evidence to the contrary. Thus, it argues there was no evidence that Orion prevented Homeowners' performance.

{¶94} Construing the evidence most strongly in favor of Homeowners, reasonable minds could come to different conclusions about the evidence submitted at trial. *See* Civ.R. 50(A)(4). Orion's office manager acknowledged that Homeowners had requested documentation for their mortgage company. It was her testimony that she sent the information directly to the mortgage company. Yet, Ms. Kaeka testified that the mortgage company never informed her it had received the information. She also testified that she received no response from the office manager on the two occasions she reached out to ask for the required documentation. Her testimony constituted evidence that Orion never produced that documentation. The weight of that evidence was not a matter the trial court could consider in ruling on Orion's motion for directed verdict. *See Ulrich v. Mercedes-Benz USA, L.L.C.*, 2010-Ohio-348, ¶ 6 (9th Dist.), quoting *Kane*, 2007-Ohio-702, at

¶ 18 (9th Dist.) ("A motion for a directed verdict assesses the sufficiency of the evidence, not the weight of the evidence or the credibility of the witnesses."). The jury, if it chose to believe Ms. Kaeka's evidence, could have concluded that Orion impeded Homeowners' ability to perform under the Contract. *See Carter*, 2022-Ohio-3462, at ¶ 52 (9th Dist.). Orion has not shown that the trial court erred by denying its motion for directed verdict. Accordingly, its third assignment of error is overruled.

### III.

**{¶95}** Orion's assignments of error are overruled. Homeowners' assignments of error on cross-appeal are also overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

_____

JILL FLAGG LANZINGER
FOR THE COURT

HENSAL, J.
CONCURS.

CARR, J.
CONCURRING IN PART, AND DISSENTING IN PART.

{¶96} I respectfully dissent from the majority's judgment to the extent that it concludes that the trial court properly awarded summary judgment to Orion on Homeowners' CSPA counterclaim. I would conclude, that given the timeframe of the Contract, it fell within the CSPA and not the HCSSA, as it was a consumer transaction and not a home construction service, as the definition of home construction service did not include remodeling at the time. *See Estate of Tomlinson v. Mega Pool Warehouse, Inc.*, 2023-Ohio-229, ¶ 22-25 (5th Dist.), *rev'd on other grounds*, 2024-Ohio-1065, and *Beder v. Cerha Kitchen and Bath Design Studio, LLC*, 2022-Ohio-4463, ¶ 7-18 (11th Dist.). In my view, the recent change to R.C. 4722.01(B) to clearly include remodeling within the definition of home construction service was made in order to alter the existing law, not to more clearly set forth the legislature's original intent; this is so, because prior to the change, all appellate courts which had addressed the issue had concluded that home construction service did not include remodeling. Thus, prior to the change, the existing law was that home construction service did not include remodeling and thus remodels fell within the CSPA. *See Estate of Tomlinson* at ¶ 22-25; *Beder* at ¶ 7-18.

APPEARANCES:

RONALD A. SKINGLE, Attorney at Law, for Appellant/Cross-Appellee.

LAURA K. MCDOWALL, Attorney at Law, for Appellees/Cross-Appellants.

SENECA KONTURAS, Attorney at Law, for Appellees/Cross-Appellants.